## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PRINCESS DENNAR, M.D.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO.** |
| **THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND** | * | **JUDGE _____** |
| | * | **MAGISTRATE JUDGE _____** |
| | * | **JURY TRIAL DEMANDED** |

## COMPLAINT

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, Princess Dennar, M.D., who, for claim against defendant, The Administrators of the Tulane Educational Fund ("Tulane"), avers as follows:

## PARTIES

### 1.

Princess Dennar, M.D. ("Dr. Dennar") is a physician practicing and licensed to practice in the State of Louisiana. She is employed by defendant, Tulane, as an Assistant Professor at the Tulane University School of Medicine. Dr. Dennar is the Program Director of the Medicine Pediatrics Residency Program at Tulane (hereinafter "Med-Peds") and the Medical Director of Tulane Primary Care Clinic at University Medical Center. She was originally recruited to Tulane in January 2008 as Medical Director of the Internal Medicine Residency Ambulatory Service. She assumed the role of the Co-Program Director of the Med- Peds Program in September 2008 pending the retirement of the incumbent Program Director. She was announced as Med-Peds Program Director on December 1, 2009, and has served in that capacity since that time.

00553244.WPD;1

2.

Dr. Dennar is a black female citizen of the United States.

3.

She is the first and only black female residency Program Director in the Tulane School of Medicine.

4.

Defendant, The Administrators of the Tulane Educational Fund ("Tulane"), is a corporate citizen of Louisiana, and, in that capacity, operates and is responsible for the acts of the Tulane University School of Medicine.

5.

While not named as defendants herein, the conduct complained of was orchestrated and carried out by Dr. Jeffrey Wiese ("Dr. Wiese") and Dean Lee Hamm ("Dr. Hamm") during the course and scope of their employment with Tulane.  Dr. Wiese served in multiple positions within Tulane's medical school which gave him authority and power over Dr. Dennar and her working conditions and environment.  Dean Hamm likewise had control and power over Dr. Dennar's program, position, and employment.

**JURISDICTION/VENUE**

6.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Dr. Dennar's claims arise under 42 U.S.C. § 2000(e), Title VII of the Civil Rights Act of 1964.

7.

The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Dr. Dennar's Louisiana state law claims.

8.

Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District and as each defendant resides in this District.

9.

Dr. Dennar has complied fully with all prerequisites under Title VII and has received a Right to Sue Letter.

**CAUSES OF ACTION**

10.

In addition to her federal claims brought pursuant to and under 42 U.S.C. § 2000(e), Dr. Dennar also brings claims against Tulane for abuse of rights, and discrimination, harassment, the creation of a hostile work environment, and retaliation  in violation of Louisiana's anti-discrimination laws at La. R.S. 23:332.

**OPERATIVE FACTS**

11.

At all times pertinent hereto, Dr. Dennar has been an Assistant Professor in the Tulane University School of Medicine.

12.

At all times pertinent hereto, Dr. Dennar has served as Program Director of the Med-Peds Residency or Medical Director of the Internal Medicine Primary Care Clinic at University Medical Center.

13.

The Med-Peds Program is that part of the Tulane School of Medicine in which Residents train in both pediatrics and internal medicine.  Dr. Dennar was responsible for the development of those Residents.

14.

During the course of her service to the University and her program, Dr. Dennar observed and has been burdened by many acts of discrimination and the creation of and ongoing conduct constituting a race and gender based hostile work environment which have adversely impacted her employment, program, position, duties, responsibilities, authority, assignments, service, pay, and her ability and opportunity to recruit Residents independently into her Program.

15.

As she complained about race and gender based discrimination, she has been subjected to retaliation through diminishment of her job responsibilities, access to resources, program, position, duties, authority, assignments, service, pay, and her ability and opportunity to recruit Residents into her Program.

16.

She has also been discriminated and retaliated against by a failure to receive timely consideration for and promotion to the rank of Associate Professor and to receive the emoluments and benefits thereof.

17.

When Dr. Dennar originally interviewed for a Directorship at Tulane in 2008, she was informed by Dr. Lee Hamm ("Dr. Hamm"), who was then Chair of the Internal Medicine Department, and now Dean of the Tulane School of Medicine, that Tulane did not "want to change the face of Tulane" and that "I'm afraid that white medical students wouldn't follow or rank favorably a program with a black program director; [however] we'll be comfortable with you sharing a position as co-director with the previous [white male Med-Peds] program director."

18.

Based on those limitations and restrictions for over a full year, Dr. Dennar shared a 50% title but did 100% of the supervisory and program planning work which, based upon Dr. Hamm's inappropriate remarks, was in an effort to mask her leadership of the program.

19.

During that year in which Dr. Dennar assumed full leadership, she steered the Med-Peds Residency Program to full accreditation by the Accreditation Council for Graduate Medical Education ("ACGME") for the first time.  Nonetheless, Tulane refused to publicly disclose Dr. Dennar's ascension into this position, to the Accreditation Counsel for Graduate Medical Education ("ACGME") and the National Residency Match Program ("NRMP") until one year later in

December 2009 after Dr. Hamm was able to obtain another white male to function as her Assistant Program Director to aid in recruiting white Residents.

20.

Thereafter, when she assumed the status as the sole Director of the Residency Program, the goal posts were shifted such that rotation scheduling for Residents, which was previously under the management and supervision of the Med-Peds Program Director, was moved to the management and supervision of the Internal Medicine Program Director, Dr. Jeffrey Wiese ("Dr. Wiese"), who also serves concurrently as the Associate Dean of Graduate Medical Education ("GME") and Tulane's Designated Institutional Official ("DIO), such that he had responsibility for ensuring compliance with ACGME institutional requirements.

21.

In his multiple capacities, Dr. Wiese has substantial control and an apparent recognized and conflict of interest permitted by Tulane.

22.

In 2014, Dr. Dennar matched an all female and all minority class of Residents (four Black females, one Hispanic female, and one Asian female) that was expected to graduate in June 2018.

23.

On June 16, 2017, Dr. Dennar served as a witness for her then Program Coordinator when that individual filed charges of discrimination against Dr. Wiese's then Program Manager.  The assertion was that Dr. Wiese's Program Manager had discriminated against Dr. Dennar's Program Coordinator based on race.

24.

That investigation determined that Dr. Wiese's Program Manager had committed the asserted unlawful acts and that Program Manager abruptly left her position at Tulane.

25.

After Dr. Dennar served as a witness for discrimination against Dr. Wiese's Program Manager for the Internal Medicine Residency Program, Dr. Wiese began a campaign of retaliation against Dr. Dennar, her Program Coordinator, Residents in the Med-Peds Residency Program, and the Med-Peds Residency Program.

26.

Dr. Dennar observed other acts of race based discrimination which she raised with Dr. Wiese.

27.

Each time Dr. Dennar confronted Dr. Wiese and GME leadership about unfavorable or discriminatory treatment, she was either rebuffed, threatened, told to back off, or instructed to be a team player.

28.

On January 11, 2018, a Black female Resident, who was also in Med-Peds, independently filed a complaint with ACGME against Dr. Wiese and the Internal Medicine Residency Program regarding educational and workplace violations in an effort to improve patient safety and secure physical wellness.  The anonymity of this Resident, which should have been protected, was disclosed.

29.

In February 2018, Dr. Wiese went against GME policy for the recruitment of Residents and Fellows between training programs at Tulane in retaliation against Dr. Dennar and negotiated with two of Dr. Dennar's former interns to transfer them from the Med-Peds Residency to the Internal Medicine Residency without her permission.

30.

In April 2018, seven Black female Residents collectively filed a complaint with ACGME and Tulane's Office of Institutional Equity ("OIE") asserting various discriminatory acts by Dr. Wiese and put forth a formal demand for a fair and equitable educational experience at Tulane.

31.

On April 6, 2018, Dr. Dennar filed a separate complaint with OIE arising out of race and gender-based discrimination perpetuated by Tulane through Dr. Wiese.  The acts complained of included, *inter alia*:

(1)     Discriminatory practices forcing a more difficult rotation schedule on Residents of minority backgrounds;

(2)     Refusal to allow minority Residents to complete the required ACGME rotations needed for graduation;

(3)     Threats to reduce the Med-Peds Residents annual intake number from six Residents to four Residents under the guise of "restructuring" GME;

(4)     Refusal to allow Dr. Dennar to operate with the needed and appropriate authority to actually perform her responsibilities as the Med-Peds Program Director;

(5)     Requiring Residency Program Directors and Fellowship Directors to use a discriminatory program introduced by Dr. Wiese called "ATLAS," which was used to match potential Residents with Tulane.  The ATLAS tool imposed by Dr. Wiese was used to prepare the final rank Residency/Fellowship List.  ATLAS is structured to rank traditionally black LCME accredited medical colleges on the most bottom of the list on par with international medical schools such that doing exceptionally well on standardized tests still would not make graduates of these schools competitive;

(5)     Undermining Dr. Dennar's leadership and authority and depriving her of the responsibilities of her position as the Medical Director of the Internal Medicine Residency Ambulatory Clinic;

(6)     Retaliating against Dr. Dennar for having raised concerns over the improper treatment and recruiting of minority Residents.  Dr. Wiese retaliated against Dr. Dennar by threatening to look at and minimize the contributions that Dr. Dennar and the Med-Peds Residency had made to the institution to suggest that she should remain silent or he would close the Program down as the DIO.

32.

In June 2018, ACGME extended an egregious site visit and issued a citation to the Internal Medicine Residency, the Med-Peds Residency, and the institution.

33.

ACGME also found that race or gender discrimination could not be excluded as a reason for these deficiencies given that the Med-Peds residency program is made up of a higher percentage of

minority residents than the Internal Medicine residency. As a result of all of these findings, ACGME gave Tulane the official "Warning Status."

34.

Since Dr. Dennar voiced concerns of discrimination and retaliation, Dean Hamm, Dr. Wiese, and others in positions of authority in the GME office, have continued a pattern of retaliation against Dennar, the Med-Peds Program Coordinator and other black females in the Med-Peds residency.

35.

Above referenced identified acts of discrimination, harassment, and retaliation, as well as additional acts, are spelled out in greater detail below.

36.

The Tulane residency structure employs a four plus one system for the IM Department. Under that structure four weeks are allocated to either inpatient wards, critical care and ER or subspecialty elective time followed by one week of ambulatory outpatient medicine.

37.

During the four-week periods, the Med-Peds Residents, particularly those of minority background and women were disproportionately given wards and critical care time and deprived of ER or elective time necessary to round out their training and experience. This became more evident after June 2017 and particularly with the all female minority class.

38.

Those practices discriminated against Residents of minority background by forcing on them a more difficult rotation schedule and denying them access to needed skills and training.

39.

Pursuant to ACGME Policy IV.A.8.a., the total required critical care experience must not exceed eight months and must include at least three months in pediatrics and at least two months in internal medicine.

40.

Because of flaws in Tulane's management system, there was a time when a minority female Resident was not given vacation for the entire year. When this inappropriate outcome was brought to Dr. Wiese's attention, rather than provide the minority Resident with her needed vacation time, he took away her subspecialty elective time in lieu of her vacation time.

41.

Dr. Wiese continued to violate normal processes to deprive the Med-Peds Residents of needed and desired training.

42.

These deprivations took on greater intensity subsequent to June 2017. All of the deprivations were done without the approval of the Med-Peds Program Director, Dr. Dennar.

43.

During an eight month term in medicine, approximately two weeks might be allocated toward subspecialty electives and the remaining 7.5 months would be wards or ICU. This deprived the minority Residents of access to ER and subspecialty elective training required for graduation. This became more evident with the  all women minority graduating class of 2018 which included residents like Dr. Okeke who also filed charges against Tulane.

44.

Tulane's refusal and failure to allow minority Residents to complete the required ACGME

rotations needed for graduation violates several ACGME policies, including IV.A.8.a., IV.A.9.b.,

IV.C., and IV.E.  Dr. Dennar objected, to no avail.  The violations resulted in an ACGME egregious

site visit to Tulane on June 21, 2018.

45.

On November 29, 2018, the ACGME report from the June 21, 2018 egregious site visit found

that the allegations brought forth by the seven Black females of unsupervised procedures on patients,

extended duty hours, lack of monitoring in the Internal Medicine Department, and an overburdening

of the Med-Peds residency program and deficiencies in certain rotations were true.

46.

ACGME  found that race or gender discrimination could not be excluded as a reason for

these deficiencies given that the Med-Peds residency program is made up with a higher percentage

of minority residents than the Internal Medicine residency Program. As per the ACGME Nov 2018

report, "It was noted that the medicine pediatrics residency program has more individuals of color

than the IM program, and an association could not be excluded." With all  of these findings,

ACGME gave Tulane the official status of "Continued Accreditation with "Warning Status."

47.

ACGME  found that there was a potential conflict of interest and structural issues that can

arise from Dr. Wiese occupying both role as the Program Director of Internal medicine residency

and the DIO.  As per the ACGME report:

"There is a structural conflict that results from Dr. Wiese's dual role as IM program director and DIO/Associate Dean of GME and chair of the GMEC. This likely makes it more challenging to impossible when residents or program directors seek a resolution to concerns through the GMEC, particularly when the concerns may pertain to the actions of Dr. Wiese in one of his roles.

In response to a question to the dean [Hamm] whether the Tulane University School of Medicine has an ombudsperson, particularly given the potential structural issue and potential for conflict of interest, given that the director of the IM program also is the DIO, Dr. Hamm noted that, at present, there is no such person. He added that, following receipt of the complaint, institutional leadership has had been discussing appointing one of the medical school's associate deans with that responsibility. No action had been taken at the time of the site visit."

48.

ACGME found that Tulane had violated Dr. Dennar's authority as the Med-Peds Program

Director as part of the ACGME Program Requirement IV.C:

"The program director should have the sufficient authority and resources to enact any changes required to the combined program. (Core)

The main issue, as identified by the Committee in careful consultation with the field activities office, is that the relationship between the core Internal Medicine program director and the program director of this combined program is not collaborative and healthy. As an example, they had not met in person in the time between the site visit was announced and the time it occurred. There are significant disagreements about the philosophy and implementation of combined training and the core Internal Medicine program director seems to have taken decisional command. Complicating this relationship is the fact that institutional oversight by the Designated Institutional Official (DIO) poses an inherent conflict, as the DIO would be required to audit himself. There was no apparent institutional mechanism identified by the site team to resolve this conflict of interest.

The program director of a combined Internal Medicine-Pediatrics program has the responsibility and authority for curricular design and implementation *in cooperation with* the program directors of the core Internal Medicine and Pediatrics programs. The Committee calls for a return site visit next year to assess the effects of changes that the Tulane leadership and GMEC implement to address this core."

49.

In June 2018, Dr. Dennar was notified by a Med-Peds intern ( minority background) that he was not going to be promoted to his subsequent PGY 2 year at the end of June. Neither Dr. Dennar nor intern had received any written notification of concerns that would warrant this action. The intern was informed of this decision indirectly through a schedule on "amion" that was posted publicly by the Internal Medicine residency department. The Med-Peds Clinical Competency Committee had already  met and had not issued any changes that would result in him having to make up any additional time.   As per the ACGME  report on this matter, " There appeared to be a failure of timely communication of this information to the medicine-pediatrics program director, with the current communication challenges resulting from the complaint to the OIE being implicated as a contributing factor."

50.

 2018 was the first year Tulane was to graduate an all minority female class in Med-Peds. However, that class was not allowed by Dr. Wiese  to complete the required four weeks emergency medicine rotation or subspecialty elective requirements.  Typically,  on an annual basis, Dr. Dennar would send both the Internal Medicine Program Director and the Pediatrics Program Director and their respective Chiefs the remaining requirements for each Med-Peds resident which became known as the "blue-green sheets."  The Pediatrics Program Director and Chiefs would meet with Dr. Dennar

to confirm the schedule before the schedule is sent out to ensure that the Med-Peds residents are meeting their requirements while rotating in Pediatrics. The Internal Medicine Program Director, Dr. Wiese, and Chiefs would meet with Dr. Dennar, but Dr. Wiese would assume decisional command and send out a schedule that was not consistent with the ACGME requirements that Dr. Dennar had provided. This resulted in the Med-Peds residents having a shortage in their Internal Medicine portion of the ACGME requirements.

51.

Dr. Dennar is the only Black female residency Program Director at Tulane and has not been able to maintain authority of her residency program without the DIO's direct interference, unlike other Program Directors at Tulane.

52.

In response to complaints made by Dr. Dennar, on one occasion, Dr. Wiese informed "they won't need this in the future; I think it's a useless rotation [anyway]." And, he advised "You can do what I do and just forge their requirements."

53.

After Dr. Dennar protested Dr. Wiese's actions and attitude, she was informed by her Residents that Dr. Wiese had allegedly advised them that the requirements did not matter to him and that they needed to be team players and accept that, which they understood to mean accept his decisions without protest.

54.

The Residents informed Dr. Dennar that Dr. Wiese stated in an educational session, he would be willing to take a "slap on the wrist" if they contacted ACGME. Whenever Dr. Dennar would

voice concerns about this directly to Dr. Wiese, he would threaten her position or the closure of the program in his role as DIO.

55.

The black female Residents also reported that Dr. Wiese informed them that the buck stopped with him and that no one else mattered in the decision making process which they understood to mean that Dr. Wiese had supplanted Dr. Dennar's authority and that the Residents had to follow his directions and take orders from him.

56.

Further, the ACGME requirements state that Residents should be given four blocks (16 weeks or 4 months) of subspecialty elective time in their four years.  However, due to the decisional command and scheduling imposed by Dr. Wiese, which disproportionately and adversely impacted the Med-Peds Program, more adversely after June 2017, some of the black female Med-Peds Residents received only six weeks of elective time during 24 months of  internal medicine rotation.

57.

In response to concerns expressed by the black female Residents and Dr. Dennar in April 2018, Dr. Wiese threatened to permanently reduce the number of Residents in Dr. Dennar's program from six to four and further subverted Dr. Dennar's ability to perform her role as the Med-Peds Program Director and the Medicine Director for Internal Medicine Residency Clinic.

58.

In July 2018, Dr. Dennar received an email from Dr. Wiese's Assistant Program Director ("APD"), Dr. Anthony Marsh,  informing her that he had been asked by Dr. Wiese  to form an ambulatory based Resident Evaluation Committee that will be known as the Clinic Educational

Committee ("CEC"). The plan was to have the committee review resident's performance and to design /develop program wide expectation processes to enhance the clinic experience for residents.

59.

Prior to the formation of this CEC committee, Dr. Dennar would meet with the Medical Director for the VA and other clinical services , in the capacity of Medical Director for the Residency clinic, to address these goals as this was part of her responsibilities.

60.

After the formation of the committee, Dr. Dennar was not regularly invited to meetings and her responsibility for developing the goals and responsibilities of residents in the clinic as Medical Director was diminished. For example,  Internal Medicine residents from Dr. Dennar's UMCNO Internal Medicine clinic who were funded to attend that clinic  were abruptly reallocated to the newly opened New Orleans Veteran Affairs Medical Center inpatient service without her approval.

61.

ACGME Policy 11-A.1 instructs that there must be a single program director with authority and accountability for the operation of the program and Policy 11-A.6 instructs that program directors must demonstrate collaboration and coordination of curriculum and rotations.

62.

Dr. Wiese ignored and violated these obligations by usurping Dr. Dennar's authority.  As a result of Dr. Dennar's complaints, he actively undermined Dr. Dennar's ability to fulfill her role as Program Director.

63.

According to ACGME, the Program Director should have the authority to approve program faculty members for participation in the residency programs education at all sites. In addition, the Program Director should have the authority to remove  program faculty members for participation in the residency program education at all sites. While Dr. Wiese was able to meet with every faculty that interviewed at Tulane for the Internal medicine department, Dr. Dennar was very rarely given the opportunity to interview a new faculty member that would participate with her residents in any of the institutions.

64.

Evaluations given of other faculty or Chief residents in her role as Program Director or Medical Director were often dismissed or usurped by Dr. Wiese.

65.

Dr. Dennar, as Program Director, had  access to portions of an evaluation tool, Med-Hub, that would allow her to review faculty or Chief  evaluations.  After engaging in protected activity, that access was removed or blinded. Similarly, Dr. Dennar's access to duty hour reporting for rotations in Internal Medicine was also removed so she would not be able to assess rotations that violated residents duty hour restrictions.

66.

On several occasions, Dr. Dennar communicated with Dr. Wiese regarding the fact that the medicine rotations were not meeting ACGME guidelines for the Med-Peds Residents' curriculum.

67.

The Med-Peds residents should complete 2/3 the amount of time of an Internal Medicine resident  rotation on the wards or ICU which should average out to approximately 31 weeks of inpatient time and 8 weeks ( not to exceed 16 weeks) of ICU/CCU time during their 24 months in Internal Medicine. However, the Med Peds residents were completing approximately 42 weeks of inpatient time and 16 weeks  of ICU/CCU in 24 months of Internal Medicine.

68.

The Internal Medicine residents' rotations should have been approximately 46 weeks of inpatient wards time and 28 weeks of ICU/CCU in their 36 months of Internal Medicine. However, in 2018, the Internal Medicine Residents were doing only 38 weeks of inpatient ward time and an average of 18 weeks of ICU/CCU. Their average amount of elective and subspecialty time should have been approximately 26 weeks but was actually approximately 50 weeks.

69.

The Med-Peds residents average amount of time in elective/subspecialty time was 8 weeks instead of the required 16 weeks  in 2018.

70.

In essence, Dr. Wiese was allocating more than the required elective/subspecialty time to the Internal Medicine residents and taking it away from residents who were under Dr. Dennar's authority in the Med-Peds residency. Of note, a significant portion of those residents were minority females as opposed to the Internal Medicine department.

71.

Dr. Wiese's response was nearly always the same refrain that Med-Peds Residents need to act like team players and not a separate class with preferential treatment. In essence, when the Med-Peds Residents requested that their educational requirements be met, Dr. Wiese ignored them and accused them of not being team players.

72.

After one specific complaint by a Med-Peds Resident and Dr. Dennar's objections in January 2018, Dr. Wiese retaliated by threatening to reduce the class intake from six Residents to four for the upcoming academic year under the guise of "restructuring" GME . Such an act would have been very impactful to the reputation of the Tulane Med-Peds residency program. A reduction in allocated slots implies a reduction in financial support and translates to residency instability. He also communicated to Residents discouraging them from speaking with ACGME. As a result of these threats, fear of retaliation was reflected in the anonymous 2017-2018 Med Peds resident survey conducted by ACGME and again in the 2018-2019 survey.

73.

A retaliatory email on January 31, 2018, to Dr. Dennar regarding obtaining innately qualified residents to justify not keeping our allocated number was also issued by Dr. Wiese:

> We are at the eleventh hour for match position allocations, and the final decision on those allocations will be at tomorrow's GMEC meeting.
>
> In fairness, I believe it is way too late to change the med-peds match allotment. And in truth, I am not opposed to keeping the match allotment at six positions provided we are able to fill those positions

with quality talent, and provided that the program provides appropriate support to the pediatrics and medicine programs.

That said, I am concerned about the program coming up short last year, and that one of the five of six that was matched was a person who went unmatched the year prior (who was at the bottom of the medicine match list for that year). I just think that doing both medicine and pediatrics in a shortened time frame is a challenge in and of itself, and pulling someone in out of SOAP, or someone not innately qualified to pass both boards, is not a healthy proposition for the med-peds program.

What I am going to propose to the GMEC is that that med-peds keeps six in the match this year, but with two reversions; meaning that if it does not fill, the first unfilled position would add to pediatrics match complement, and if there is a second unfilled position, it would go to medicine' match complement. Of course, if the program fills entirely, then all six would go to med-peds. All three program directors do need to ensure that everyone on the match list is of sufficient quality to endure two three-year training programs in four years. To the extent that he is available, I will ask Paul Gladden to chair that component of the meeting. But in advance of that, it would be useful to have all on this email weigh in on this issue in advance of the meeting tomorrow night.

At some point in the near future, I think the leadership of both medicine and pediatrics needs to come together to discuss the contributions that the medicine-pediatrics residency program offers to the needs of both programs, as this is a core ACGME requirement of the med-peds program that it contributes to, and not detracts from, the operations of both of the core programs. That discussion can come later, though as both programs are preparing to construct schedules for next year, it would be good if that discussion came sooner than later.

Let me know your thoughts.  (Underscoring added.)

74.

Dr. Dennar's response that same night was a follows:

I'm surprise to hear this! Last year was the first year in 9 years that Med Peds did not match. It was also the first time that we went below our second tier.  The person we pulled from the SOAP is an MDPhD

with good scores, who allegedly only ranked one program so that she could stay closer to home. She scored higher than some categorical residents in both the Medicine and Pediatric inservice score this year. So even with the SOAP "scramble", she is qualified. The scramble was an isolated incident---not a trend. Consequently, I believe like Dr. Wiese stated Med Peds should be given the opportunity to maintain its numbers.

I do not anticipate Med-Peds going through the SOAP this year. But pulling allotted numbers ---if we do not match---will disrupt the balance of shared patient panels, continuity of care, inpatient call coverage during the switch---not to mention the morale of the residents.

The Med-Peds residents are equally Internal Medicine residents as they are Pediatric residents. Their narrative will always be that they are as strong as the core programs that trained them because they are simply a peninsula---an extension of what is good and bright in Medicine and in Pediatrics.

Similar to every program, there are few residents who are weaker and a few that are stronger. Overall, we have made major contributions to the both programs and I ask that the revision not be proposed.

75.

In addition to threatening to reduce the number of Med-Peds Residents from six to four, Dr. Wiese, in violation of ACGME Policy D, actively enticed and negotiated with two Med-Peds interns encouraging their movement out of the Med-Peds Residency into his Internal Medicine Program. He did this without communication with Dr. Dennar and in disregard of the GME policy.

76.

A Resident was reprimanded by Dr. Dennar for concerns with professionalism and interpersonal skills and communication and was put on a coaching plan that required observation for potential remediation. As part of Tulane's GME policy, the program director and faculty from the recruiting program must refrain from actively initiating, enticing or negotiating with the

candidate until the resident's current program director has given approval for this communication. Dr. Wiese in his capacity as DIO, circumvented policies and conventions of line management in the organizational structure.

77.

After the reduction in the Med-Peds complement, Dr. Dennar should have been allowed to recruit two spots as a result of the vacancies.  However, Dr. Wiese contacted the Pediatric  Program Director (another white male)  and informed him that he would give him 1.0  FTE Pediatric slot in lieu of the two 0.5 FTE  Med-Peds slots that should have been allocated to Dr. Dennar. Dr. Wiese never informed Dr. Dennar of his decision directly, Instead she was informed through an email that went to the public House-staff list serve.

78.

One Resident, an Indian female who Dr. Wiese initially referred to as "not innately qualified" and on the bottom of his rank list in the January 31, 2018, email, contacted Dr. Wiese to transfer from Med-Peds to Internal Medicine after she was reprimanded by both faculty from the Pediatrics department and Dr. Dennar for conduct reflecting a lack of professionalism and inappropriate conduct  which  adversely  impacted  patient  care  in  the  Pediatrics  Department.

79.

In order for a Resident to transfer from one program to another, it requires following the GME policy as outlined below:

> **GME Policy: D. Recruitment of residents and fellows between training programs at Tulane:**
> 1. When a position in a training program is, or becomes, vacant, vacancy and its intent to fill the position after receiving approval from the DIO.

2. A resident who is interested, but who is currently under contract in another Tulane training program, may apply for the open position.

3. The resident applicant must disclose to the recruiting program director any contractual obligation that currently exists to his or her current program. The resident must also disclose to his or her current program director the intention to pursue the open position,

4. The program director and faculty from the recruiting program must refrain from actively initiating, enticing or negotiating with the candidate until the resident's current program director has given approval for this communication.

5. A letter of intent to release the resident from his or her contractual obligation and a letter of recommendation outlining his or her performance with respect to each of the core competencies must be obtained from the current program director before a contract can be offered to the resident by the recruiting program.

6. The start date for the resident in the new program must be approved by the resident's current program director.

7. The DIO will serve as the mediator in any situation in which the two program directors cannot reach an amicable resolution to the resident wishing to switch programs.

8. Failure to abide by the rules set forth in this section may result in a reduction in the program's complement for the following year.

80.

Without contacting Dr. Dennar, Dr. Wiese subverted Dr. Dennar's authority and granted the Resident's request. Dr. Wiese did not follow any of the steps outlined in the GME policy regarding recruitment of residents and fellows between training programs at Tulane.  Consistently, Dr. Dennar was treated differently, as the only Black female,  from the other Program Directors.

81.

In addition to the obligations imposed and rights existing under Title VII, both Tulane's GME and the ACGME each have anti-discrimination policies which are contractual.

82.

In active violation of each, Dr. Wiese introduced and mandated use of ATLAS as a quality tool ostensibly to help rank medical students based on their individual quality and to report this ranking and quality to the Provost's office.

83.

The ATLAS program gives quality scores to all medical schools and the quality school for historically black colleges are given the lowest quality school.

84.

Historically black colleges and universities are given the same low score as a score from a school outside of the United States.  Consequently, students who go to these HBCU schools or schools with a far greater percentage of minorities are automatically placed on a lower quality ranking tier through the ATLAS system employed at the direction of Dr. Wiese.

85.

More particularly, the rubric ranks under-represented minority applicants from traditionally black medical colleges in the lowest tier, regardless of their academic performance on standardized examinations, class rank, or the Dean's list.

86.

In so doing, Tulane instituted a screening process which discriminated against minority students who graduated from traditionally black medical colleges by undervaluing their performance and the quality of their education based upon invalid and unlawful race based factors and maintained

a reduction in the number of minority physician trainees in Tulane's residencies, particularly the

Internal Medicine department.

87.

Dr. Wiese authored an email which states:

> "I would like us to use the ATLAS document to track quality points
> for each applicant . . . This will help you in assessing an applicant's
> relative strength even as the recruitment proceeds . . . enabling
> aggressive recruiting from the beginning for those applicants who you
> know will be at the top of the list (i.e., **high quality score**) . . . the
> primary purpose of ATLAS is to help you make more objective
> decisions in selecting candidates for interviews and in making the
> final rank list.  In particular, **ATLAS integrates the quality of the
> medical school from which the applicant comes**, class core tile
> from that school, as well as Board scores . . . The third additional
> field on the sheet is under-represented minorities.  While the decision
> as to who we admit to our residency and fellowship programs should
> still ride on overall quality and ability, I do want us to take a more
> active role in recruiting under-represented minorities, including
> LGBTQ.  Should you find several applicants and a cohort of more or
> less the same quality score, you might look to prioritize the under-
> represented minority applicant."

88.

This statement by Dr. Wiese is disingenuous on its face as his imposed ATLAS tool does not

appropriately provide for an unbiased objective assessment.  Rather, it promotes an assessment

which disadvantages minorities as his ATLAS template knowingly ranks traditionally black medical

colleges at a lower tier and he routinely reviewed Dr. Dennar's rank list prior to submission to ensure

that ATLAS ranking of HBCU schools was followed, and black Residency candidates were stopped

from "matching with Tulane."

89.

ACGME Policy 6.B.3 instructs that the Program Director, Dr. Dennar, in partnership with the sponsoring institution, must provide a culture of professionalism that supports patient safety and personal responsibility.

90.

Dr. Wiese actively undermined Dr. Dennar's leadership as the Medical Director of the Internal Medicine Residency Ambulatory Clinic by ignoring her valid concerns over unprofessionalism of Residents that threatened patients' safety and disregard of personal responsibility.

91.

Based upon a specific correspondence with the ACGME and a group letter from several black female Residents in the combined Med-Peds Residency, ACGME scheduled, and on June 21, 2018, conducted a site visit to investigate the allegations of race and gender discrimination.

92.

In the days leading up to the ACGME egregious site visit, continuous acts of intimidation against the Residents was perpetuated by Tulane through phone calls, emails, and meetings.

93.

Dr. Dennar was herself to select an oversampled (ACGME requested mostly female and minorities) group of minority female faculty and Residents to meet with the ACGME.

94.

The night before the June 21, 2018, ACGME site visit, Dr. Dennar was advised by Tulane's General Counsel's office that Tulane had added additional all white faculty to attend Dr. Dennar's portion of the investigation.

95.

One day later, Tulane's Office of Institutional Equity ("OIE") conducted an allegedly independent investigation of Dr. Dennar's April 6, 2018, complaints.  Deborah Love, then Director of OIE contacted Dr. Dennar to determine if Tulane's General Counsel had also provided her and the seven Black female Residents with names of attorneys to use as she had learned that this was offered to Dr. Wiese prior to start of the OIE investigation and Ms. Love wanted to ensure that we were all treated fairly. General Counsel did not offer the same amenity to Dr. Dennar.

96.

The investigation, contrary to law and Tulane's own contractual commitments set forth in University contracts, including Tulane's Anti-Discrimination Harassment policy, was by no means independent and failed to reach accurate or appropriate conclusions.

97.

The investigator, Ellen Rains, was then an associate with the New Orleans office of the law firm of Ogletree Deakins.

98.

Ms. Rains then worked in connection with and/or under the supervision of Partner/Director, Mark Mallery.

99.

In the past, Ogletree and Mr. Mallery have been retained as defense counsel for Tulane in litigation brought by former faculty against Tulane, and, on information and belief, other matters to which Tulane was a party.

100.

There is substantial and legitimate concern as to whether counsel who seeks representation of or has represented an entity should or is able to perform an "independent examination" of the entity because they are by definition potentially not independent.

101.

On August 31, 2018, Ms. Rains issued a report on her investigation.  The report itself has numerous errors, including, but not limited to, the inaccurate assertion that "Dr. Dennar admits . . . that she was not required to use th[e] ATLAS tool."

102.

Further, Ms. Rains reached conclusions which inappropriately conflate her understanding of legal concerns in litigation with Tulane's obligation to neither discriminate nor harass on the basis of race or gender.  In so doing, she dismissed elements of discrimination and harassment incompatible with University policies and contracts based upon a conclusion that Dr. Dennar had not suffered any adverse employment action.

103.

Ms. Rains further conflated complaints made by Residents attributing them to Dr. Dennar and then finding no valid basis for a discrimination complaint.

104.

On November 2, 2018, Dr. Dennar filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") which, in large measure, tracked her April 6, 2018, internal complaint, but also noted further retaliation from occurring shortly after Dr. Dennar and the Med-Peds minority Residents were interviewed by Ms. Rains in connection with her internal complaint.

105.

Dr. Dennar's annual reappointment letter with Tulane was written on July 1, 2018, but not received until August 1, 2018.

106.

The reappointment letter reveals that Tulane had increased Dr. Dennar's workload while decreasing her base salary.

107.

The punitive nature of these acts were the result of retaliation against Dr. Dennar for her having filed official letters of complaint raising issues of race and gender based discrimination and harassment.

108.

Dr. Dennar's reappointment letter revealed the creation of a new administrative section in her contract and shifted approximately $30,000 from her base salary to an administrative office appointment authorizing the former Chair to void or eliminate that portion of the salary which had been inappropriately taken from the base salary.

109.

On August 3, 2018,  Dr. Dennar questioned her Section Chief on why the sudden change in her reappointment after discovering that no one else with directorship titles had an "administrative" section added.  At that time, she was informed by her Section Chief that she was not sure but " it came from the Department."

110.

As Dr. Dennar's retirement plan is determined by her base salary, a reduction in the base salary would cause a reduction in Tulane's contribution to her retirement.

111.

When Dr. Dennar complained about this obvious impropriety, Tulane withdrew these specific actions and did not diminish her salary as threatened in the contract presented to her.

112.

Had Dr. Dennar not complained, the retaliatory conduct would have been in effect.

113.

Still, further, Dr. Dennar continues in the junior position of Assistant Professor.  Under normal progression, Dr. Dennar would have advanced to Associate Professor within five to seven years.  The failure to properly and timely  promote her to Associate Professor is based on her status as a black woman and/or in retaliation for her having raised issues of discrimination as there is no legitimate purpose for her having not yet been promoted to Associate Professor with all of the emoluments that such a promotion entails.

114.

Additional acts of retaliation which diminished her professional responsibilities and subverted her ability to fulfill all of the obligations of her position include the changes to the terms and conditions of her employment such that her authority, responsibilities, and access to critical resources as a Program Director were diminished, impeded, and/or adjusted so that they now differ from all white Program Directors; and restrictions on her authority and the concomitant tools needed to optimally function as the Med-Peds Program Director.

115.

On information and belief, Dean Hamm and Dr. Wiese were responsible for removal of Dr. Dennar's access to computer platforms (known as MedHub) which allowed her to perform duties as Program Director such as reviewing evaluations of Residents and Faculty, Resident procedure logs, and Resident duty hour violations.

116.

Specifically, on July 8, 2018, Dr. Dennar's MedHub access was suddenly removed in response to which Dr. Dennar lodged a formal complaint.

117.

Some MedHub access was not restored until October 29, 2018. Thereafter, on July 31, 2019, Dr. Dennar informed that her MedHub access was reduced to basic features of a mentor instead of the features necessary and appropriate for her in her role as a Medical Program Director.

118.

On March 6, 2020, after a meeting with Linzi Conners on that issue, Dr. Dennar was granted MedHub access like or similar to the kind allocated to other Program Directors.

119.

Had Dr. Dennar not pressed her complaints about the discriminatory and retaliatory treatment, the adverse impacts and treatment would have remained.

120.

On July 2020, it was discovered that the Med-Peds Residents' Medhub access to all three departments (Internal Medicine, Pediatrics, and Med-Peds) were removed to prevent the Med Peds residents from putting in their duty hours when they rotated in the Internal Medicine department. This was done without Dr. Dennar's input or knowledge.

121.

Computer platforms known as Red Wiki provide tools which enable Dr. Dennar to perform her duties as Program Director such as collaborating with other Program Directors, reviewing institutional citations and GME minutes, obtaining resources needed to prepare for an ACGME site visit, and keeping up with GME policies.

122.

On October 20, 2019, Dr. Dennar observed that her access to Red Wiki was denied prior to an ACGME institutional site visit on October 22, 2019.

123.

Dr. Dennar's access, which was essential to allow her to collaborate and consult with other Program Directors and to participate and select GME meeting activities needed for timely and accurate updated GME policies pertaining to her program, was actively subverted.

124.

On November 12, 2019, Dr. Dennar emailed GME, of which Dr. Wiese was the Director, requesting that her access be reinstated.  On November 13, 2019, she was informed that access was restored.

125.

Had Dr. Dennar not pressed her complaints about the discriminatory and retaliatory treatment, the adverse impacts and treatment would have remained.

126.

On October 4, 2019, Dr. Dennar sent an email to several individuals, including Dr. Wiese and Dr. Hamm, informing them of an upcoming AGCME site visit scheduled for October 22, 2019.

127.

In her communication, she called to their attention that she had not received any information from leadership like that which was accorded to other Program Directors.  She requested that she be included in the process and be allowed to present for the Med-Peds representation.

128.

On October 7, 2019, Dr. Dennar again requested to be included in ACGME processes, having made such a request in the past.  Her request was not honored and she never received a response.

129.

As a result of this affirmative act of exclusion, she has not been informed of meetings or the results of meetings that are routinely attended by other Program Directors and she has not been given the results of the institutional site visit like other Program Directors.

130.

Dr. Dennar's name was omitted from credentialing at Children's Hospital, a new site of training for physicians in her Program.

131.

As a physician cannot practice at a hospital when they have not been credentialed at that hospital, Dr. Dennar was excluded from fulfilling her professional functions.

132.

It is to be noted that the Pediatric Program Director, a white male, who had not made complaints such as those made by Dr. Dennar, did not face such an impediment and obvious retaliatory conduct.

133.

When Dr. Dennar inquired as to the situation, she was affirmatively informed that her name was not on the list of faculty members submitted for credentialing.  As a consequence, Dr. Dennar had to personally contact Children's Hospital herself and was eventually credentialed.

134.

Had Dr. Dennar not taken such active steps, the retaliatory punishment would have permanently deprived her of credentials necessary to perform her job responsibilities.

135.

Dr. Dennar's name was actively and affirmatively removed from the GME list serve causing her to not receive emails which go out to all members of the School of Medicine. As a result, she did not receive and was not able to act on important emails pertinent to her job and safety.

136.

As an example, on November 8, 2019, Dean Hamm forwarded an email solely and exclusively to Dr. Dennar. The email originated earlier that day from another source. In that forwarded email, Dr. Dennar was informed that two individuals with rifles were seen on foot in the parking garage where Dr. Dennar parked her car.

137.

As a result of being excluded from the initial email(s) that placed the staff on alert and warned them not to park in that area, Dr. Dennar was not simultaneously provided with such notice and was potentially exposed to a concern as to which other individuals had been placed on notice and informed to avoid. Dr. Dennar had to contact the police captain before she received any notice of clearance the following day.

138.

An important role in the life of the Tulane Medical School is the Designated Institutional Officer. Dr. Dennar, as Med-Peds Program Director, was assigned a DIO different from that of all other Program Directors.

139.

A DIO's essential responsibility is to remain up to speed on all job related requests from Program Directors and to accommodate or otherwise assist Program Directors by helping to facilitate the carrying out of important work processes or functions.

140.

The DIO assigned to Dr. Dennar confirmed to her that he was totally unfamiliar with items requested by her and was unable to accommodate such requests.

141.

Whenever Dr. Dennar confronted the DIO on his obvious lack of cooperation as it relates to teamwork, that DIO would routinely and frequently remark that Dean Hamm or Dr. Wiese would have to approve the particular request then being made by Dr. Dennar.

142.

The net result of all of the obvious inefficiencies is that almost none of Dr. Dennar's requests to the assigned DIO were approved, thus interposing an unnecessary inefficient layer of bureaucracy and further subverting and burdening the performance of her professional responsibilities and impairing her progress.

143.

Dr. Dennar made several requests to GME for assistance in connection with an AGCME Med-Peds site visit taking place on December 4, 2019.

144.

Her request went ignored except to the extent that she, as the Med-Peds Director, was advised "you should clean the room for the visit." Thereafter, when Dr. Dennar questioned the impropriety of that directive, she was informed that she could "get the room cleaned."

145.

Between December 9, 2019, and April 24, 2020, further steps were taken which diminished her job functions and authority as Program Director, unduly hampering her ability to perform her job responsibilities. Most particularly, in addition to her obligations as Program Director, she had imposed upon her the responsibilities of "Program Coordinator," thus compounding her responsibilities as Program Director with those of the Program Coordinator all without additional compensation.

146.

While Dr. Dennar is "core faculty," she was the only Internal Medicine faculty member not affirmatively listed as "core faculty."

147.

Prior to Dr. Dennar's filing her initial EEOC complaint, she was able to evaluate the IM Residency Program as a core IM faculty member. As a consequence of her being unfairly removed as core faculty, she no longer receives those evaluations

148.

In addition to this act diminishing her status, it had adverse practical ramifications in that she is not allowed to provide feedback about the internal medicine department or its faculty. In addition, to not being seen as core faculty in the Internal Medicine department, the former chair. In addition,

Dr. Dennar had not been invited to the Department of Medicine  Leadership & Chiefs monthly meeting in the entire 12 years at Tulane until August 27, 2020, two days after the EEOC proposed a mediation of her pending complaint against Tulane.

149.

Further, inasmuch as she was removed from a core IM faculty list, she was unable to meet on October 22, 2019, through Internal Medicine to express her concerns regarding the mistreatment of her Med-Peds Residents.

150.

After Dr. Dennar contacted ACGME requesting a meeting, the field officer requested to meet with Dr. Dennar and the Med-Peds Residents separately on October 22, 2019.

151.

Dr. Dennar's removal from the ACGME Internal Medicine roster for the October 22, 2019, annual survey also inhibited her ability to evaluate the Internal Medicine Program and provide feedback.

152.

Dr. Dennar was told by Dr. Hamm that she would not be assigned to an office space at a new location where her Internal Medicine colleagues were to be relocated.

153.

On August 2, 2019, she met with Dr. Hamm, Dr. Wiese, and others to review an ACGME citation response that was due on August 31, 2019.

154.

During the meeting, Dean Hamm asked everyone to clear the room but for Dean Hamm, Dr. Dennar, the Pediatric Chair, Dr. El-Dahr, and Trenell Smith.

155.

During that small group meeting, Dean Hamm informed Dr. Dennar that he had instructed Sue Pollack to not respond to Dr. Dennar's request to relocate with her Internal Medicine colleagues because they decided to move Dr. Dennar and the entire Med-Peds Program to another location away from the Internal Medicine or Pediatric Residency.

156.

Subsequent thereto and after Dr. Dennar's complained about this abuse as a form of segregation, she was allowed to move with her colleagues but she received an inferior office space compared to that of all other Program Directors.

157.

In March 2020, as the Covid crisis was expanding, all of Dr. Dennar's Positive Protective Equipment (PPE) and life saving equipment, were removed from her Med-Peds Clinic while she was actively seeing patients.

158.

Dr. Dennar was informed by the Associate Chief Operating Officer, Shawn Flinn, that Dean Hamm wanted her and the other faculty, each a minority female, to personally see patients without the Residents to protect the safety of the Residents. This had not been done in any other Residency Clinic.

159.

In May 2020, at Dean Hamm's direction, Shawn Flinn stated that Dr. Dennar's Med-Peds Clinic was to relocate. The indicated site lacked space sufficient to continue training her Residents.

160.

As of this date, resources have been removed from the Clinic and no suitable location for the Med-Peds Clinic or supplies including administrative personnel have been provided in response to requests by Dr. Dennar.

161.

Dr. Dennar was on the Equal Opportunity and Institutional Equity Committee and had a three year appointment.

162.

On October 6, 2019, before the three year term was over, Dr. Dennar was informed that she rotated off that Committee.

163.

Her premature removal from that Committee was in retaliation for Dr. Dennar's complaints and perpetuated the hostile environment.

164.

The numerous events and improper actions described herein demonstrate an ongoing program or harassment, discrimination, retaliation, and perpetuation of an unlawful hostile environment intended to force her to resign her employment and to be driven from her workplace and profession.

165.

On October 20, 2019, Dr. Dennar issued an open letter to Tulane Provost Robin Forman and University President Michael Fitts for help with dealing with the discrimination and exclusion from GME and ACGME institutional site visit.

166.

In her correspondence, Dr. Dennar requested an independent investigator to investigate her complaints of discrimination and a hostile work environment. The University responded to that request by again contacting Ellen Rains, the allegedly unbiased neutral investigator who had performed the investigation previously referenced herein.

167.

Dr. Dennar objected to the appointment of Ellen Rains as anything but neutral and unbiased.

168.

In response, Dr. Dennar, acting through undersigned counsel, received communication from Ms. Rains' superior, Mark Mallery, offering that he would perform the investigation.

169.

That Tulane would have reached out to the same investigator who had already rejected Dr. Dennar's previous filed grievances and thereafter attempt to supplant Ms. Rains with her superior, is on its face indication of the absence of commitment to any truly neutral or unbiased investigations.

170.

Since Mr. Mallery's overture was rejected, Dr. Dennar believed that no investigation had taken place. However, on September 12, Dr. Dennar was informed that the investigation had taken place. She was provided no specifics other than to be informed that Tulane asserted that she declined to participate in the investigation and that Tulane rejected her complaint.

171.

On May 15, 2020, the ACGME issued citations arising out of the December 4, 2019, site visit which resulted in the status of Continued Accreditation with Warning to the Med-Peds Program.

172.

The Med-Peds Program citation were mostly the direct result of a violation by the conduct of the Internal Medicine Department, particularly related to and arising out of an absence of lockers in the area where Residents on call slept between shifts while in Internal Medicine, the continuous insufficient authority of the Med Peds program Director to enact any changes required to the combined program, work hour violations in the Internal Medicine department, the lack of Associate Program Director financial support provided to the Med-Peds Program,  and the lack of protected time during Monday school in the Internal Medicine department.

173.

Subsequent thereto, on May 29, 2020, Tulane instituted a special review with respect to the Med-Peds program but did not institute a special review of the Internal Medicine Program, despite the fact that the focus of the citation related to the Med-Peds Residents were the conditions arising from adverse treatment while in the Internal Medicine Program.

174.

Absent retaliation against Dr. Dennar as a desire to perpetuate a hostile environment, it is inconceivable that a problem exists with regard to the larger Internal Medicine Program and that the only Program subject to internal review is the Med-Peds Program which is essentially a subset of the larger Internal Medicine Program.

175.

The special review of Med-Peds was a direct product of Dr. Wiese's retaliation against Dr. Dennar for her series of complaints of discrimination and a hostile environment.

176.

That special review is ongoing at present.

177.

As part thereof, Dr. Dennar has been asked to produce irrelevant documents and demands are being made to pull her away from her professional responsibilities, despite her full cooperation. In addition, residents were being forced to meet with the GME faculty which resulted in an email being sent from a couple of residents to GME expressing concerns of retaliation and an attempt to intimidate residents and faculty from the Med-Peds program as a result of their honesty in the ACGME resident survey.

178.

Separate from the special review, Dr. Dennar was required to participate in a monthly meeting in which Dr. Wiese was not required to participate, despite the fact that the Internal Medicine Program received the same ACGME citations status in November 2018 Site Visit report as that issued to the Med-Peds Program. Rather than have Dr. Wiese attend, he required or instructed an Associate Program Director, a minority female, to attend the meetings in his place.

179.

Dr. Dennar's funding for the Med-Peds program are now subjected to approval prior to every expenditure by Sue Pollack under the direction of Dean Hamm despite routine budgeted approval in the past. Dean Hamm has refused to sign approval letters for residency activities that were approved in the past.

**VIOLATION OF TITLE VII, 42 U.S.C. § 2000(e), BY DISCRIMINATION, HARASSMENT, AND CREATION OF A HOSTILE ENVIRONMENT**

180.

Dr. Dennar incorporates by reference each and every allegation of Paragraphs 1-179 of this Complaint.

181.

The foregoing demonstrates Dr. Dennar has endured an ongoing pattern of discrimination, harassment, and a hostile environment by and through numerous separate, continuous, and cumulating acts of retaliation and abuse which diminish her responsibilities, status, position, and deprive her of access to needed tools, information, and resources needed to fulfill her responsibilities, and which comprise an ongoing active attempt to drive her from her position inside the University, all in violation of Title VII, 42 U.S.C. § 2000(e).

182.

The violations, which cause an ongoing distress, were orchestrated and carried out through the decisions and direction of Dr. Wiese and Dean Hamm, acting with the full authority of Tulane as Dr. Dennar's employer.

183.

Dr. Dennar has been damaged to the extent she has been denied a promotion and appropriate compensation as an Associate Professor and is entitled to back pay to compensate for her wage loss and benefits loss based on the difference between her salary as an Assistant Professor and that which she should have received as an Associate Professor.

184.

As a result of the violations, Dr. Dennar is entitled to receive front pay, back pay, compensatory damages, punitive damages, attorney's fees, and costs.

## VIOLATION OF THE LOUISIANA ANTI-DISCRIMINATION STATUTES THROUGH INTENTIONAL DISCRIMINATION IN EMPLOYMENT

185.

Dr. Dennar realleges and incorporates each of the allegations of this Complaint in their entirety as if set forth in this paragraph in their entirety.

186.

Louisiana law, including La. R.S. 23:332, makes it unlawful for an employer to intentionally discriminate against any individual with respect to compensation or terms, conditions or privileges of employment because of that individual's race, color, religion, sex or national origin.

187.

Through unlawful race and gender discrimination against Dr. Dennar, through the creation of a hostile environment, harassment and retaliation against Dr. Dennar in her job duties, responsibilities, and opportunities, and by failing to promote and/or appropriately compensate Dr. Dennar, Tulane has violated Louisiana law.

188.

As a result of Tulane's unlawful acts, Dr. Dennar is entitled to receive front pay, back pay, compensatory damages, attorney's fees, and costs.

## ABUSE OF RIGHTS

189.

Dr. Dennar restates in her entirety and incorporates herein each of the prior allegations of this Complaint as if copied in their entirety in this paragraph.

190.

Louisiana civilian tradition recognizes a cause of action for abuse of rights when, *inter alia*, actions even if otherwise not unlawful when the actions are immoral or unconscionable.

191.

Abuse of rights has been recognized as a viable cause of action in connection with employment conditions in the work place.

192.

The cause of action for abuse of rights as recognized in Louisiana applies when one of the four following conditions is met:

(1)     If the predominant motive for it was to cause harm;

(2)     If there was no serious or legitimate motive for refusing;

(3)     If the exercise of the right to refuse is against moral rules, good faith or elementary fairness; or

(4)     If the right to refuse is exercised for a purpose other than for which it was granted.

193.

The facts and actions described throughout this Complaint affirm that defendants' conduct violated each of the proscriptions against so acting.

194.

Based upon the facts set forth hereinabove and incorporated in this count, the actions of Tulane constituted an abuse of rights for which Dr. Dennar is entitled to all general and special damages, including loss of income and benefits, and general damages.

## DEMAND FOR TRIAL BY JURY

195.

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, Dr. Princess Dennar, demands a trial by jury on all questions of fact the Complaint raises.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Dr. Princess Dennar, prays that this Complaint be served and that after defendant answers and all proceedings are had herein, there be judgment in favor of plaintiff, Princess Dennar, and against defendant, The Administrators of the Tulane Educational Fund, such that plaintiff receives an award of the following, to be determined at trial or as otherwise appropriate:

a.   An award of back pay, front pay, punitive damages, emotional distress based damages, lost benefits, and other damages Dr. Dennar suffered to be determined at trial under Title VII , the Louisiana Employment Discrimination law and as a result of the abuse of rights;

b.   An award of prejudgment and post-judgment interest;

c.   An award of costs and expenses of this action together with reasonable attorney's fees and expert fees; and

d.   Such other relief as this Court deems just and proper.

Respectfully submitted,

**LOWE, STEIN, HOFFMAN, ALLWEISS
  & HAUVER, L.L.P.**

**/s/ *Michael R. Allweiss***
**MICHAEL R. ALLWEISS (#2425)**
**MELANIE C. LOCKETT (#30601)**
**ABIGAIL F. GERRITY (#35777)**
**701 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70139**
**Telephone:    (504) 581-2450**
**Facsimile:     (504) 581-2461**
**Attorneys for Princess Dennar, M.D.**

**PLEASE SERVE:**

The Administrators of the Tulane Educational Fund
through its registered agent for service of process:
Victoria D. Johnson
Suite 3600, Gibson Hall
6823 St. Charles Avenue
New Orleans, LA 70118